# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  2:09-cr-00386-JCM-GWF |
| | ) | |
| vs. | ) | **FINDINGS AND** |
| | ) | **RECOMMENDATION** |
| LEONARDO DELIS, | ) | |
| | ) | |
| Defendants. | ) | Motion to Suppress (#27) |

　　　This matter is before the Court on Defendant's Motion to Suppress Involuntary and Uncounseled Statements (#27), filed on April 7, 2010 and the Government's Response to Defendant's Motion to Suppress (#30), filed May 4, 2010. Defendant contends that following his arrest pursuant to a warrant, (1) North Las Vegas Police officers questioned him without advising him of his *Miranda* rights, (2) that Defendant refused to speak with the officers and invoked his right to remain silent, (3) that Defendant was transported to the police station where he was placed in a holding cell, and (4) that he was then further interrogated without his consent and without being advised of his rights. Defendant also argues that his alleged admissions were obtained through coercion and were not voluntary.

　　　The Court conducted an evidentiary hearing on August 31, 2010. The Government called three witnesses, North Las Vegas Police Officers Brian Booker and Steven Wiese, and Detective Flory Stucky. Defendant was permitted to call North Las Vegas Police Officers Vaughn and Parra as witnesses at a continued hearing on September 10, 2010. Officers Vaughn and Parra testified, however, that they have no recollection of Defendant's arrest or detention.

. . .

**FACTUAL BACKGROUND**

Officer Brian Booker testified that on February 12, 2009 at approximately 8:00 a.m., he and Officer Wiese were conducting surveillance in the vicinity of an apartment complex located at 5 West Webb Street, North Las Vegas, Nevada where Defendant Leonardo Delis was believed to reside. Defendant Delis was a suspect in several burglaries that the officers were investigating. There were also outstanding warrants for his arrest. Officer Booker testified that the officers intended to arrest Defendant on the warrants and then attempt to question him about the burglaries. Officers Booker and Wiese were in plain clothes and in unmarked vehicles. At approximately 9:30 a.m., the officers observed Defendant Delis walking between apartment units. Officer Booker radioed uniformed officers in marked patrol vehicles to apprehend Defendant and take him into custody. Officer Booker testified that the uniformed officers pulled up in their vehicles to where the Defendant was walking, took him into custody and placed him in handcuffs. Officers Booker and Wiese then drove their vehicles some distance away, parked and walked back to where Defendant was detained.

Officer Booker testified that he arrived at the location where Defendant was being detained approximately 5 minutes after he was arrested. As Officer Booker approached Defendant, he heard the uniformed officer ask Defendant his name. Defendant gave a false name. Officer Booker asked Defendant if he remembered him and asked him why he was lying. (Officer Booker testified that he had arrested Defendant a year and a half earlier.) Defendant acknowledged that he knew who Officer Booker was and acknowledged that he was Leonardo Delis.

Officer Booker testified that Officer Wiese arrived on the scene shortly after he did. Officers Booker and Wiese escorted Defendant to a curb area away from where he was initially detained and where a crowd had gathered. Officer Wiese read the *Miranda* warnings to the Defendant. He asked Defendant if he understood his rights and the Defendant said he did. Officer Wiese asked Defendant if he wanted to speak to the officers and Defendant said he did. Defendant was not asked to sign a written waiver of his *Miranda* rights. Although the North Las Vegas Police Department has such a form available, Officer Booker testified that he does not normally use the form and would not use it to obtain a written waiver from a suspect who is already handcuffed.

Officer Booker testified that he told Defendant that the officers were investigating burglaries that they knew Defendant was involved in and that the officers would like to ask him questions about burglaries. Officer Booker testified that the officers were aware from their investigation that there might be stolen firearms and other stolen property in Defendant's residence. He asked the Defendant if there was anything illegal in his apartment and Defendant said no. He asked Defendant for permission to search his apartment and Defendant also said no. Officer Booker testified that he was informed that other officers asked Defendant's mother, who resided in the apartment complex, for permission to search her apartment and she also refused.

Officer Booker testified that the area where Defendant was detained was not conducive to conducting an interview or interrogation. A crowd had gathered in the vicinity and other criminal suspects or their family members were believed to reside in the area. He also testified that the apartment complex is located in a known "high-crime area." Officer Booker asked Defendant if it would be okay to take him to the detective bureau to talk to him there. Defendant agreed to go to the station or detective bureau for questioning. Officers Booker and Wiese then transported Defendant from the apartment complex. On their way to the detective bureau, the officers stopped at a Jack-In-The-Box restaurant where they purchased lunch for Defendant. The officers then drove to the detective bureau which is located in an office building and which Officer Booker states has an "office like" atmosphere. They arrived at the detective bureau at approximately 12:00 p.m. Defendant Delis was taken to an interview room, which was approximately eight by ten or ten by ten feet, where his handcuffs were removed. Defendant was left alone in the locked room to eat his lunch. Officer Booker checked in on the Defendant periodically and he was allowed to leave the room for smoke breaks.

Officer Booker testified that no guns were pointed at or displayed to Defendant Delis after he was arrested at the apartment complex. Officer Booker indicated that once they arrived at the detective bureau, he may have covered his holstered weapon under his shirt so that it was not visible to Defendant. Officer Booker described Defendant's emotional demeanor at the apartment complex as being a little upset, nervous and aware of everyone who was in the area. On the way to the detective bureau, Defendant appeared to be depressed about his situation, but was calm and

friendly towards the two officers, who also treated him in a friendly and non-adversarial manner.

Officer Booker testified that he and Detective Flory Stucky began to interview Defendant Delis at approximately 1:30 p.m. The officers did not re-inform Defendant of his *Miranda* rights. The officers told Mr. Delis that they were investigating burglaries or that they wanted to clear up some burglaries. They asked Defendant if he would be willing to cooperate and tell the truth. Mr. Delis stated that he would. The officers told Defendant that they knew he was involved in burglaries. Defendant admitted that he had committed burglaries. The officers then questioned Defendant about specific burglaries – when and where they occurred. Mr. Delis responded by trying to describe the location of the burglaries. He was unfamiliar with street names, however, and tried to describe the locations by landmarks with which he was familiar. Officer Booker testified that Defendant's descriptions were confusing. Detective Stucky asked Defendant if the officers could drive him around and have him show them the locations where the burglaries occurred. Defendant agreed to do so.

Defendant was then taken to Detective Stucky's unmarked sedan. Defendant sat in the front passenger seat. He was not handcuffed. Detective Stucky drove and Officer Booker sat in the rear passenger seat behind the Defendant. Defendant gave directions where to drive and when they reached a location where a burglary occurred, he would point out the premises. The officers asked him additional questions to verify the burglary, such as when it occurred. Officer Booker described Defendant's demeanor during this driving interrogation as again being unhappy about being in trouble, but also as friendly and non-adversarial towards the officers.

Officer Booker testified that during the driving portion of the interrogation, Defendant was asked whether he had any firearms. Defendant first admitted that he had one firearm and then admitted having a second firearm. Defendant stated that the first firearm was a 9 millimeter handgun which was obtained during a burglary. He stated that the second firearm was a .45 caliber handgun that he had purchased in exchange for money and drugs. The Defendant informed the officers that both weapons were located in his bedroom at his mother's apartment. One firearm was located in the pocket of a jacket hanging in the closet and the other was in a Nike bag. The officers thereupon ended the interrogation. At that point, the officers and Mr. Delis had been

driving around for a approximately two hours. The police thereafter obtained a warrant to search Defendant's mother's apartment for firearms. The two handguns identified by Defendant were found and seized during the execution of the search warrant.

Officer Booker acknowledged on cross-examination that when Defendant was initially stopped and taken into custody, the uniformed officers pointed their weapons at him, placed him face down on the ground and searched and handcuffed him. He also acknowledged that an hour passed from the time Defendant was arrested and until he was taken from the apartment complex to the detective bureau. Defendant was left alone in the interrogation room, except for a restroom or smoking break, for another one and one-half hours until Detective Stucky and Officer Booker began the interview. The interview was not recorded. Officer Booker testified that it could have been audio-recorded if the officers had chosen to do so. He did not know if the interview room had video recording equipment.

Officer Booker acknowledged that he did not state in his written arrest report that Defendant had refused to give consent to search his apartment. Officer Booker also acknowledged that upon observing Defendant's mother leaving the apartment complex, he radioed other officers and requested that they find some legitimate reason for stopping Defendant's mother, such as jaywalking. He testified that he wanted to detain Defendant's mother so that officers could ask her questions about the Defendant. He also requested that other officers detain Defendant's mother a little while longer so that she could be asked more questions. Officer Booker believed that Defendant's mother was detained for approximately 20 minutes. He admitted that it is illegal to detain an individual beyond the period justified by the purpose of the stop. He testified, however, that it is not improper to ask questions unrelated to the purpose of the stop, so long as it does not prolong the stop. Officer Booker also testified that the police had some information that Defendant's mother was possibly involved in the burglaries, but this information was not included in his report. Officer Booker also testified that the officers obtained consent from the renter to search the other apartment that they saw Defendant going in and out of, but that this information was also not included in his report.

. . .

Officer Booker testified that at no time did he hear Defendant state that he did not want to discuss crimes that were not related to his arrest. He had no recollection of Detective Stucky telling him that Defendant had made such a statement. He was also unaware that Detective Stucky stated in her written report that Defendant had initially stated that he did not want to discuss other crimes. Officer Booker testified that he would immediately stop questioning an in-custody suspect who stated that he wanted an attorney. He would not, however, necessarily cease further questioning if a suspect stated that he did not want to talk to the officers. He might again ask questions if the suspect indicated that he did not want to talk at that particular time or location. He would, however, cease further questioning if the suspect made clear that he would not speak with the officers. Officer Booker reiterated on redirect examination, however, that, to his knowledge, Defendant Delis did not state at any time that he did not want to speak with the officers or that he did not want to talk about burglaries or crimes unrelated to his arrest.

Officer Steven Wiese's testimony was consistent with that of Officer Booker regarding Defendant's initial detention and arrest. He did not, however, actually see the arrest take place. After parking his unmarked car, Officer Wiese returned to the apartment complex and observed Defendant standing in front of a marked patrol car in handcuffs. He heard Officer Booker ask Defendant questions about his identity. Officer Wiese and Officer Booker then escorted Defendant approximately 20 feet away from where he was detained to an area outside the apartment fence. Officer Wiese testified that he wanted to get Defendant away from the crowd that had gathered as well as the uniformed officers who were in the area.

Officer Wiese described Defendant's mood or demeanor as very depressed, stressed out, but alert. Officer Wiese had Defendant sit down on the curb and he advised Defendant of his *Miranda* rights by reading them from a card that he keeps on his person. He asked Defendant if he understood his rights and Defendant responded yes. Officer Wiese also testified that he asked Defendant if he wanted to speak with him, without an attorney being present, and Defendant said yes. Officer Wiese did not have a written waiver of rights form on his person or in his unmarked vehicle. He testified, however, that he would probably not have had Defendant sign a written waiver of rights if he had had one in his possession because he would have had to remove

6

Defendant's handcuffs.

Officer Wiese indicated that he and Officer Booker asked Defendant if he wanted to talk to the officers about some crimes and Defendant said yes. Defendant never stated in Officer's Wiese's presence that he did not want to answer questions. Officer Wiese testified that there was a large presence of people in the area, however, and that Defendant looked around constantly and appeared nervous and uncomfortable because of the surrounding circumstances. The officers were also aware that a suspected co-conspirator lived in the area. Officer Wiese asked Defendant if he would mind going to the detective bureau to answer questions. The Defendant stated that that would be good and he appeared to be happy about that. Officer Wiese testified that after they left the apartment complex, Defendant's mood became more friendly and relaxed. Defendant also became more comfortable when the officers stopped at the Jack-In-The-Box restaurant and bought him food. Officer Wiese dropped Officer Booker and Defendant off at the detective bureau and then left to respond to other police service calls. He did not go inside the detective bureau with the Defendant.

Office Wiese acknowledged on cross-examination that Defendant's mother was detained for jaywalking, but was not sure if this occurred before or after Defendant was taken into custody. Officer Wiese did not speak to Defendant's mother. He was aware that other officers kept her away from Defendant and he and Officer Booker. Officer Wiese also stated that Defendant refused to give consent to search his apartment. Officer Wiese stated that the request and refusal to give consent occurred approximately 20 minutes after he informed Defendant of his *Miranda* rights. He also acknowledged that Defendant's mother refused the officers' request for permission to search her apartment.

Officer Wiese testified that Defendant did not state at any time that he did not want to answer questions about crimes. He stated that he was with Defendant for almost the entire period from when he advised him of his *Miranda* rights until he left Defendant and Officer Booker at the detective bureau. Officer Wiese testified that Detective Stucky was present at the apartment complex and that she made clear to the officers that she did not want to take Defendant to the detective bureau if he was not willing to answer questions. He testified that Detective Stucky asked

Defendant if he would be willing to go back to the detective bureau to answer questions and he said yes. Officer Wiese testified that he met with Detective Stucky, Officer Booker and the Assistant United States Attorney the week before the evidentiary hearing. He was not aware, however, that Detective Stucky had reported that Defendant had initially stated that he did not want to speak with the officers about other crimes.

Detective Flory Stucky testified that she was contacted at home on February 12, 2009 by Detective Correra who asked her to assist in the investigation. She arrived at the Webb Street apartment complex at approximately 9:30 a.m. and made contact with Detective Correra. Detective Correra informed her that Officer Wiese had already given the *Miranda* warnings to the Defendant and that the officers were trying to obtain Defendant's consent to search his apartment. Detective Stucky observed Officers Booker and Wiese speaking to Defendant, but she did not actually hear what was said. Detective Stucky spoke to the officers and was advised that neither Defendant Delis nor his mother would give the officers permission to search.[1]

Detective Stucky subsequently stated in her written report that Defendant had initially refused to talk about other crimes. She testified on cross-examination that she was told this by Detective Correra, Officer Booker and Officer Wiese, but that she did not actually hear Defendant make this statement. Detective Stucky also testified that she did not want to take Defendant to the detective bureau if he was not willing to talk to the officers. She approached the Defendant and asked him if he was willing to talk to the officers. Defendant responded that he was. Detective Stucky then asked Defendant: "How about we get out of here so people aren't in your business?" Defendant said yes. Detective Stucky then instructed Officers Booker and Wiese to take Defendant Delis to the detective bureau and to stop and get him lunch on the way there.

Detective Stucky met up with Officer Booker and the Defendant at the detective bureau at approximately noon. She confirmed that Officer Wiese went to handle other police service calls. Defendant's handcuffs were removed and he was placed in the locked interview room to eat his

---

[1] It is unclear from the hearing testimony whether the officers were requesting Defendant's consent to search a separate apartment in which he resided or were requesting consent from Defendant and his mother to search the same apartment in which they both apparently resided.

lunch. Defendant remained in the interview room for approximately an hour and a half before the interview began. Detective Stucky did not observe Defendant during this entire time, but she believes he was given a restroom break and she testified that he was escorted outside to smoke a cigarette. Prior to beginning the interview, Defendant was not re-advised of his *Miranda* rights. Detective Stucky testified that waiver of rights forms were available in the detective bureau, but there was no policy requiring that written waivers be obtained from suspects. Detective Stucky stated that she does not generally use such forms if the advisement and waiver of *Miranda* warnings has been witnessed by a second officer. She stated that the detective bureau had the facilities to audio or video record the interview of the Defendant, but it was not recorded by either means.

Detective Stucky testified that she began the interview by telling the Defendant that the reason he was "here" was that he was implicated in other burglaries. She again asked Defendant if he was willing to talk and he said he was. She asked Defendant to start by telling the officers about the "closest" or most recent burglary. Defendant was unable to provide understandable locations for the burglaries, apparently because he was unfamiliar with street names. After a while, Detective Stucky asked Defendant if he would be willing to drive around with officers and direct them to the locations of the burglaries. Defendant agreed to do so. Detective Stucky, Officer Booker and the Defendant then left the detective bureau and got into Detective Stucky's unmarked sedan. The Defendant proceeded to direct the officers to four burglary locations in Las Vegas and North Las Vegas.

Detective Stucky testified that while they were driving around to burglary locations, Officer Booker asked Defendant about firearms he was believed to have. Defendant initially denied possessing any firearms. Eventually, Defendant admitted that he had a 9 millimeter pistol that had been stolen by another suspect involved in the burglary ring. Defendant appeared to give a sigh of relief when he made this admission. After some further questioning, Defendant also admitted that he possessed a .45 caliber pistol. Defendant told the officers that the 9 millimeter pistol was located in a Nike bag in his bedroom and that the .45 caliber pistol was in the inside pocket of a jacket hanging in the bedroom closest.

After confirming with Defendant that he had no other firearms, Detective Stucky and Officer Booker terminated the interview and returned to the detective bureau. Detective Stucky testified that she was concerned that the firearms might be removed by Defendant's mother or someone else and that she wanted to obtain a search warrant as quickly as possible. After obtaining a search warrant, the police searched Defendant's apartment. The .45 caliber pistol was found in the jacket pocket where Defendant stated it was located. The 9 millimeter pistol was not found in the Nike bag in Defendant's bedroom. Detective Stucky testified that another detective spoke to Defendant's mother who admitted that she had found the gun and had put it in the trash can. The 9 millimeter pistol was found in the trash can where Defendant's mother had reportedly placed it.

## DISCUSSION

### 1.   Whether Defendant Was Informed of and Waived His Miranda Rights.

Prior to custodial interrogation, law enforcement officials must inform a suspect of his *Miranda* rights. *United States v. Mejia*, 559 F.3d 1113, 1117 (9th Cir. 2009), citing *Duckworth v. Egan*, 492 U.S. 195, 202, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). Before the government may introduce statements made by a suspect who was in custody and under interrogation, the government must prove that the defendant voluntarily and knowingly and intelligently waived his *Miranda* rights. *Cox v. Del Papa*, 542 F.3d 669, 675 (9th Cir. 2008), citing *United States v. Helt*, 745 F.2d 1275, 1277 (9th Cir. 1984).[2]

. . .

---

[2] In *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2259-60 (2010), the Supreme Court recently held that after being advised of his rights, an in-custody suspect must unambiguously invoke his right to remain silent to preclude further police interrogation. Mere silence in the face of even prolonged questioning is not sufficient to invoke the right to remain silent. The Court previously held in *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350 (1994) that a suspect must unambiguously invoke his right to counsel to require the officers to cease further questioning under that part of the *Miranda* requirements. *Berghuis* also holds that even absent the accused's invocation of the right to remain silent, his statement is inadmissible unless the prosecution can establish that the accused "'in fact knowingly and voluntarily waived *[Miranda]* rights' when making the statement." (citation omitted). The waiver does not have to be express and can be implied from the totality of the circumstances.

Although the government "'need prove waiver only by a preponderance of the evidence,' *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), '[t]his burden is great' and '[w]e must indulge every reasonable presumption against waiver of fundamental constitutional rights.'" *Cox*, at 675, citing *Helt*, 745 F.2d at 1277. In order to satisfy its burden, the government must show two things. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation show both an uncoerced choice and the requisite level of comprehension, may a court properly conclude that the *Miranda* rights have been waived. *Cox v. Del Papa*, 542 F.3d at 675, citing *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 115, 89 L.Ed.2d 410 (1986). *Cox* also notes the importance of the distinction between a claim that the waiver is not voluntary and a claim that the waiver was not knowing and intelligent. The voluntariness of a waiver depends on the absence of police overreaching. *Id.*, at 675, citing *Colorado v. Connelly*, 479 U.S. at 170, 107 S.Ct. 515. The cognitive component depends on the defendant's mental capacity.

There is no dispute that Defendant Delis was in custody and that the police were required to advise him of his *Miranda* rights prior to interrogation. The Government asserts that the testimony of Officers Booker and Wise establishes that Defendant was informed of his *Miranda* rights prior to any substantive interrogation and that he voluntarily, knowingly and intelligently waived his rights and agreed to answer questions about burglaries and, eventually, about firearms in his possession.

Defendant challenges the credibility of the police officers' testimony that they informed him of his *Miranda* rights and that he waived his rights. Defendant points out that Officer Booker directed other police officers to find a reason, such as jaywalking, to stop Defendant's mother, and that he later requested that the officers detain her longer so that she could not leave the apartment complex. Defendant argues that Officer Booker's apparent willingness to engage in an unlawful stop and detention of Defendant's mother undermines the believability of his testimony that

11

Defendant Delis was informed of and waived his *Miranda* rights. Defendant also suggested that the officers engaged in an unlawful search of the apartment unit that they saw Defendant exit from before he was arrested. Officers Booker and Wiese testified, however, that the renter of this apartment gave the officers permission to search the apartment. Officer Wiese also testified that the purpose of the search was only to locate persons who might pose a danger to the officers. They did not search the apartment for evidence of criminal activity.

Defendant's counsel also argues that Defendant's alleged waiver of his *Miranda* rights is belied by his refusal to grant the officers' request for permission to search his apartment.[3] Although Defendant's refusal to grant permission to search his apartment appears inconsistent with the willingness to answer questions about criminal activity, it is not implausible. Defendant may have initially believed that he could deal with the officers during an interview without disclosing his unlawful possession of firearms. A consensual search of the apartment, however, would have likely resulted in the immediate discovery of the firearms. In any event, suspects, acting under the stressful conditions of arrest, do not necessarily take consistent positions with the police. There is also no plausible reason why Officers Booker and Wiese would falsely testify that Defendant waived his *Miranda* rights, but truthfully testify that Defendant refused to grant permission to search his apartment. The Court, therefore, is not persuaded that Defendant's refusal to permit the officers to search his apartment undermines their testimony that he was willing to answer questions about criminal activity.

Defendant also points to the absence of an executed waiver of rights form as indicating that Defendant was not informed of his rights. An executed written waiver of rights provides strong evidence that a suspect was, in fact, advised of his rights and that he knowingly and intelligently waived them. The officers' explanations for not using such forms in this case are not particularly persuasive and the Court suspects that the officers or their department are reluctant to use such forms because they may encourage suspects to invoke their rights. There is no requirement,

---

[3] Defendant's mother also refused to give the officers permission to search the apartment. There was no testimony, however, that Defendant was informed of his mother's refusal such that it would have been a factor in his decision to invoke or waive his *Miranda* rights.

however, that a suspect execute a written waiver of his *Miranda* rights. The officers' decisions to do no more than what they are required to do under *Miranda* does not prove that they failed to comply with *Miranda*.

Finally, Defendant cites Detective Stucky's statement in her written report that Defendant had initially refused to talk about other crimes, and her testimony that she was told this by Detective Correra, Officer Booker and Officer Wiese, as evidence that Defendant did not voluntarily or knowingly waive his *Miranda* rights. Detective Stucky, however, testified that she did not actually hear Defendant make this statement. She further testified that when she asked the Defendant if he was willing to speak to the officers, he said yes and that he also stated that he was willing to go to the detective bureau to be questioned. Once the interview began, Defendant also stated that he was willing to answer questions about burglaries in which he was involved.

Both Officer Booker and Officer Wiese appeared to be credible witnesses, notwithstanding some legitimate questions raised by the defense concerning their testimony. Detective Stucky also appeared to be a generally truthful witness. She was, however, nervous, overly talkative and defensive about questions asked on cross-examination. On balance, the Court finds that all three officers testified truthfully in accordance with their oath. While Detective Stucky apparently believed at the time she wrote her report that Defendant had initially refused to discuss "other" crimes with the officers, Officers Booker and Wiese denied that Defendant made any such statement in their presence. Because no witness testified that he or she actually heard Defendant make this statement, the Court finds that Detective Stucky's statement in her written report is probably erroneous. Even if Defendant initially made such a statement, he did not unambiguously refuse to answer any questions. *See Berghuis v. Thompkins*, 130 S.Ct. 2250, 2259-60 (2010), The officers' testimony also establishes that Defendant was willing to go to the detective bureau to be interviewed by the officers and that once there, he agreed to answer questions about burglaries. There is no evidence to suggest that Defendant's mental capacity was impaired, such that he did not knowingly and intelligently waive his right to remain silent or to consult with counsel prior to or during questioning.

. . .

The Court also concludes that the officers were not required to re-advise Defendant of his *Miranda* rights prior to commencing the interview. "The Supreme Court has eschewed per se rules mandating that a suspect be re-advised of his rights in certain fixed situations in favor of a more flexible approach focusing on the totality of the circumstances." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1128 (9th Cir. 2005), citing *Wyrick v. Fields*, 459 U.S. 42, 48-49, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982) (per curiam). *Rodriguez-Preciado* notes that courts have generally rejected a per se rule as to when a suspect must be re-advised of his rights after the passage of time or change in questioners. The court cited decisions upholding the admissibility of statements that were made 15 hours to two days after *Miranda* warnings were given to the suspect.

In this case, the time span between the giving and waiver of the warnings and the commencement of the interrogation was approximately 3 ½ hours. This amount of time, standing alone, did not require that Defendant be re-advised of his *Miranda* rights. Nor do the other circumstances indicate that Defendant should have been re-advised of his *Miranda* rights. Defendant was asked at least three times after he was advised of his rights whether he was willing to talk to the officers. Each time, Defendant stated that he was willing to talk to the officers. The officers informed Defendant early on that they wanted to question him about burglaries or other crimes and there was no change in the focus of the interrogation which reasonably required the officers to re-advise Defendant of his rights to ensure that his waiver was voluntarily made.

### 2. **Whether Defendant's Confession Was Voluntary.**

Notwithstanding Defendant Delis' waiver of his *Miranda* rights, the Court must also determine whether his subsequent confession was voluntary. The prosecution is required to prove by a preponderance of the evidence that the confession was voluntary. *United States v. Jenkins*, 938 F.2d 934, 938 (9th Cir. 1991) states in this regard:

> Ordinarily, to determine the voluntariness of a confession, we consider the "totality of circumstances" surrounding it. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 226-27, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Thus, the question to be faced in each case is whether the defendant's will was overborne when he confessed, *Fulminante,* 111 S.Ct. at 1252 n. 2, *i.e.,* "[i]s the confession the product of an essentially free and unconstrained choice by its maker?" *Id.* at 1261 (Rehnquist, C.J., dissenting in part).

*See also United States v. Heller*, 551 F.3d 1108, 1112-13 (9th Cir. 2009) ("we determine whether, 'considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne.' *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)." Among the factors to be considered are whether the defendant was informed of his *Miranda* rights, the accused's mental state, his age, level of education or intelligence, the length of detention, whether defendant was subjected to repeated or prolonged questioning, and the use of physical punishment such as deprivation of food or sleep. *United States v. Williams*, 435 F.3d 1148, 1153 n. 5 (9th Cir. 2006), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27, 93 S.Ct. 2041 (1973). Other factors may also be relevant. *Id.*

Officer Booker and Wiese described Defendant as being depressed and nervous while he was at the apartment complex. They also described him as being alert and aware of his surroundings. Once they drove him away from the complex and took him through the drive-in restaurant, however, his nervousness lessened. They also described their interaction with the Defendant at that point as cooperative and non-adversarial. Upon arrival at the detective bureau, Defendant's handcuffs were removed and he was allowed to eat his lunch. Officer Booker also testified that he may have concealed his firearm under his shirt so that it would not be visible to Defendant. Defendant was placed in a locked and relatively small interview room for approximately an hour and a half until the interview began. He was allowed to use the restroom and was taken outside for a smoke break under police escort. Although there is no clear explanation why the officers waited approximately an hour and a half before beginning the interview, it does not appear that this period of detention and isolation broke Defendant's resistence to questioning. To the contrary, the evidence shows that, while still at the apartment complex, Defendant stated more than once that he was willing to answer questions and was willing to go to the detective bureau to be questioned.

At the beginning of the interview, Detective Stucky and Officer Booker told Defendant that they wanted to question him about some burglaries in which they believed he was involved. There is no evidence that either officer confronted Defendant with specific evidence of his guilt and their

15

introductory statements do not amount to psychological coercion. *See United States v. Orso*, 266 F.3d 1030, 1039 (9th Cir. 2001) (holding that it is not improper to advise the suspect of the evidence against him prior to initiating questioning). There is no evidence that any threats were made to Defendant to induce him to confess. Detective Stucky testified that she told Defendant that his cooperation would be documented in the police reports and that it would be helpful to him. She also told Defendant that while she could not change what he had already done, his being truthful would help him. In *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988), the court stated that an interrogating agent's promise to inform the prosecutor about a suspect's cooperation did not render his subsequent confession involuntary, even when it was accompanied by a promise to recommend leniency or by speculation that cooperation would have a positive effect. *See also United States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994) (offer to tell the prosecutor about the defendant's cooperation and suggestion that defendant's cooperation may increase the likelihood of a more lenient sentence did not render confession involuntary); *United States v. Bautista*, 362 F.3d 584, 592 (9th Cir. 2004) (agent's statement to defendant: "If you talk to us, we can help you, but if you don't talk to us, we can't help you," did not render confession involuntary). The Court, therefore, concludes that Defendant's admissions during the interview(s) that he committed various burglaries and that he was in possession of two firearms were not the result of physical or psychological coercion. Defendant's admissions were therefore voluntary.

## CONCLUSION

Based on the foregoing, the Court finds (1) that Defendant was properly advised of his *Miranda* rights prior to any substantive interrogation, (2) that Defendant voluntarily, knowingly and intelligently waived his rights, and (3) that Defendant's subsequent admissions or confession were also voluntary. Accordingly,

## RECOMMENDATION

It is hereby recommended that Defendant's Motion to Suppress Involuntary and Uncounseled Statements (#27) be **denied.**

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be

in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 15th day of October, 2010.

_____
**GEORGE FOLEY, JR.**
**UNITED STATES MAGISTRATE JUDGE**